**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MATTHEW HERMAN**, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| **ROCK GATE CAPITAL, LLC d/b/a** | ) | |
| **160 DRIVING ACADEMY** and | ) | |
| **TRUCKER'S NETWORK**, an Illinois | ) | |
| Corporation, and **STEVE GOLD**, individually | ) | |
| in his personal capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff Matthew Herman ("Plaintiff" or "Mr. Herman"), by his undersigned attorneys, Luisi Holz Law, complains against Defendant Rock Gate Capital, LLC d/b/a 160 Driving Academy and Trucker's Network ("Defendant" or "Rock Gate"), individually for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the New York Labor Law ("NYLL") N.Y. Lab. Law § 190 *et seq.*, breach of contract, breach of the covenants of good faith and fair dealing, fraud, and quantum meruit, and in support alleges as follows.

**NATURE OF THE ACTION**

1.  Defendants failed to pay Plaintiff overtime wages and commission payments, in addition to retaliating against him for demanding that Defendants pay him the wages he owed and refusing to engage in fraud on behalf of the company.

2.  Plaintiff seeks to recover damages for unpaid wages, compensatory, liquidated, and punitive damages, attorneys' fees, costs and any other relief deemed just, proper, and equitable.

1

**PARTIES**

3.      Plaintiff Matthew Herman was a citizen of the State of New York at all relevant times. Plaintiff currently resides in Dallas County, Texas.

4.      Plaintiff was employed by Defendants from approximately April 2022 to June 2024 as a Business Development Representative ("BDR").

5.      Defendants were employers during the relevant time period, as defined by the FLSA, 29 U.S.C. §203(e)(1), and NYLL   § 190 *et seq.*

6.      Defendant Rock Gate Capital, LLC is an Illinois Limited Liability Company with its principal place of business in Chicago, Illinois 60604 and is a citizen of the State of Illinois.

7.      Defendant Rock Gate Capital, LLC is an enterprise engaged in commerce or in the production of goods for commerce, with annual gross sales of at least $500,000, within the meaning of 29 U.S.C. § 203(s).

8.      Defendant Steve Gold is a natural person who, on information and belief, resides in Evanston, Illinois. Mr. Gold is, and at all relevant times was, the CEO of Rock Gate Capital, LLC.

**JURISDICTION**

9.      The Court has federal question jurisdiction by way of the FLSA, 29 U.S.C. § 201 *et seq.*, and pursuant to 28 U.S.C. § 1331.

10.     The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff was a citizen of New York during the relevant time period (and is currently a resident of Texas), Defendant is a citizen of Illinois, and the amount in controversy exceeds $75,000.

11.     The Court has supplemental jurisdiction over Plaintiff's State law claims pursuant to 28 U.S.C. § 1367.

2

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant resides in this District and its principal places of business is in this judicial District.

## FACTS COMMON TO ALL COUNTS

### ROCK GATE CAPITAL d/b/a 160 DRIVING ACADEMY AND TRUCKER'S NETWORK

13. Defendant Rock Gate Capital, LLC operates 160 Driving Academy, a school that provides truck driver training classes at over a hundred locations nationwide.

14. Rock Gate Capital, LLC is owned and operated by Defendant Steve Gold, who also acts as its Chief Executive Officer ("CEO").

15. During the relevant time period, Defendant employed Business Development Representatives ("BDRs") like Plaintiff for purposes of selling three types of services: (1) job posting services through a truck driver recruiting platform called "Trucker's Network;" (2) training courses for individual truck drivers; and (3) enterprise sales to companies for truck driver training of the companies' driver fleet.

16. Defendants created a software application for the Truckers Network to allow companies to advertise job postings and recruit truck drivers who already have appropriate training and certifications.

17. The primary service being sold by Trucker's Network is marketing job openings to experienced truck drivers.

18. Defendants claim, including on the Truckers Network website, that Truckers Network includes over 200,000 curated CDL Drivers for companies to find "qualified drivers more efficiently than any other hiring platform." *See* https://truckersnetwork.com/.

19. In reality, the number of drivers in Truckers Network's system was materially less than the number marketed, many of whom had little to no experience.

3

**PLAINTIFF MATTHEW HERMAN'S EMPLOYMENT AND SHIFTING COMMISSION PLANS**

20.     Plaintiff accepted a position with Defendants as a BDR, with a start date of January 10, 2022.

21.     Plaintiff worked remotely for Defendants from his home in New York.

22.     Plaintiff's primary duty as a BDR was to sell job postings and services for the Truckers Network.

23.     Plaintiff earned commissions pursuant to a Trucker's Network commission plan (the "2022 TN Commission Plan").

24.     Pursuant to the 2022 TN Commission Plan, Plaintiff was paid a $50,000 base salary per year and was eligible to receive 40% commission on total Gross Revenue produced for the sale of TN job postings plus "add-ons."

25.     "Add-ons" were services that the sales representative was able to add on to the client's list of services in addition to the job posting, such as text boost notifications.

26.     Within two months, Plaintiff became one of the highest earning BDRs in the company.

27.     Plaintiff's manager, Phil Amato, did not track BDR calls per day so long as Plaintiff and other BDRs were meeting their sales quota, which Plaintiff did.

28.     Plaintiff's managers told him to ignore the number of calls he was making per day and, instead, to focus on making sales and building client relationships.

29. At the time Plaintiff was subject to the 2022 TN Commission Plan, Defendant did not have an Enterprise Sales Department and had not otherwise hired BDRs or instructed to make Enterprise sales.

30. Plaintiff received positive performance evaluations throughout 2022 and remained one of the highest earning BDRs in the company.

31. In January 2023, Rock Gate amended Plaintiff's Commission Plan to require a minimum $5,500 in job post advertisement revenue per month prior to earning any commissions at all (the "2023 TN Commission Plan").

32. This made it more difficult for BDRs selling Truckers Network to earn any commissions.

33. During the relevant time period, Plaintiff was not a manager, did not have supervisory authority over any employees, did not possess the authority to hire or fire employees, did not direct the work of two or more employees, and did not exercise discretion and independent judgment with respect to matters of significance.

34. Plaintiff's primary duty was not the management of the enterprise.

### PLAINTIFF MAKES THE SECOND LARGEST SALE IN COMPANY HISTORY

35. During sales meetings and other company events in 2023, Rock Gate's Owner and Chief Executive Officer, Steve Gold, stressed that the company was transitioning its sales focus to large Enterprise sales contracts and that BDRs like Plaintiff should make every effort to expand their existing relationships to sell Enterprise services.

36. Enterprise sales consisted of large contracts training an entire workforce of drivers (for example, Amazon or WalMart's driving workforce), as opposed to individual drivers.

37. Mr. Gold insisted that it was "all hands on deck" and that everyone would be paid on all Enterprise contracts brought in.

38. Mr. Gold explained that BDRs should deliver the client to Mr. Gold and would be paid on all final sales made thereafter to that client.

39. It was Plaintiff's understanding, based on discussions with Mr. Gold, that he would earn far more making Enterprise sales than he had earned making TN sales.

40. On Mr. Gold's insistence, Plaintiff made significant efforts to make Enterprise sales and sell larger truck driver training contracts to companies with driver fleets.

41. In or about October 2023, Plaintiff procured an enterprise contract for training a very large driver fleet.

42. The services Plaintiff sold included training thousands of drivers at a per driver rate.

43. If Plaintiff were paid a meager 3% commission on this contract (he is entitled to more), he would receive millions in commission payments.

44. On December 28, 2023, Mr. Gold announced that the contract procured by Plaintiff was the second largest client deal in company history and that Plaintiff would receive the commission for generating this account.

45. Emily Cavelier, one of Defendants' c-suite executives, told Plaintiff that the company began training drivers under that contract in December 2023.

46. In or about February 2024, Mr. Gold offered Plaintiff a new position making Enterprise sales full-time and Plaintiff accepted.

47.     Throughout early 2024, Plaintiff made various Enterprise sales, but Defendant refused to pay him his full commissions on those sales, including the sale discussed above, the second largest sale in company history.

48.     Mr. Gold and supervisors refused to provide Mr. Herman with a summary of his commissions or sales for Enterprise contracts, despite Mr. Herman having asked multiple times.

49.     Mr. Gold oversaw and made decisions regarding Plaintiff's compensation and, to Plaintiff's understanding, that of all other employees as well.

### PLAINTIFF'S REQUEST FOR PAYMENT AND COMPLAINTS

50.     Soon after he sold the large contract, in early 2024, Plaintiff began asking questions regarding the commission he earned and when he would receive it.

51.     Plaintiff asked for a summary of his commissions from his supervisor multiple times, and each request was met with a refusal.

52.     Plaintiff continued to request payment of a commission for the large enterprise sale discussed above and subsequent enterprise sales he made throughout March, April, and May 2024.

53.     During this time, Plaintiff made certain complaints to his supervisors regarding TN sales and his sincere belief that the company could not hold up to the representations they were making to then current and prospective regarding truck driver job postings.

54.     For example, Defendant claimed that there were over 200,000 qualified trucker drivers available for hire in its Truckers Network.

55.     Plaintiff believed this number to be drastically inflated, which Plaintiff disclosed to his supervisor.

56.     As a result of the inflated numbers, Plaintiff received complaints from his TN customers that, despite posting multiple ads monthly, they were not receiving the qualified drivers

promised. These complaints lead Plaintiff to believe that Defendants were misrepresenting the actual membership of TN to his potential customers, and requiring him to do the same.

57. Specifically, the number of members, and their actual experience, did not measure up to that which Defendants were marketing to potential customers.

58. As Plaintiff understood it, even if a client specifically requested more experienced drivers and paid more for premium advertisement slots, the only drivers available, according to the clients, were new graduates with little experience.

59. Plaintiff also disclosed this to his supervisor, who brushed his concerns aside and refused to address Plaintiff's well-founded complaints.

**2024 ENTERPRISE COMMISSION PLAN**

60. Plaintiff continued requesting his commission payment for the accounts he had sold Enterprise services for. Every time he requested his commissions or information related thereto, he was refused payment or brushed off.

61. On the morning of May 10, 2024, Kevin Murphy called Plaintiff to inform him that he was being converted to an hourly employee, that his prior agreement had been rescinded and position eliminated, and that he would receive a new Commission Plan to sign, which would encompass both TN and Enterprise sales (the "2024 TN and Enterprise Commission Plan").

62. Mr. Murphy, as he had on prior occasions, promised that this new Commission Plan would make it easier for Plaintiff and other BDRs to earn commissions and increase their overall wages.

63. Mr. Murphy called Plaintiff again at 2:00 p.m. that same day, screamed at him to sign the 2024 TN and Enterprise Commission Plan, and claimed that if he did not sign it by the

end of the day, he would not be permitted to sell Enterprise services any longer and would potentially be terminated.

64. Fearful that he would lose his job, Plaintiff immediately signed the 2024 TN and Enterprise Commission Plan.

65. It was Plaintiff's understanding that this 2024 TN and Enterprise Commission Plan applied beginning on June 1, 2024 and going forward and did not encompass any Enterprise sales made by Plaintiff prior to June 1.

66. For Truckers Network sales made pursuant to the 2024 Commission Plan, the BDR would earn zero commissions until the BDR reached 15 total sales in the month.

67. Overall, the BDRs were set to make significantly less on TN sales pursuant to this modified Commission Plan.

68. For Enterprise sales made pursuant to the 2024 Commission Plan, the BDR would receive a 3% commission for the first year and a 1.5% commission for the second year in the month any continued revenue is received.

69. While Plaintiff made a additional Enterprise sales, he was never paid in full on those sales pursuant to the 2024 TN and Enterprise Commission Plan, and was refused the information by Defendants that would allow him to determine whether he was being appropriately compensated.

70. In any event, the 2024 TN and Enterprise Commission Plan was signed involuntarily and under duress.

71. Plaintiff eventually received a new offer letter agreement for his hourly position to review and negotiate, but it was not signed before his termination.

72. As a result, Plaintiff did not have any agreements with Defendants at the end of his employment other than his agreement with Mr. Gold regarding enterprise sales.

73. Neither the 2024 TN and Enterprise Commission Plan, nor any other agreement describing Plaintiff's commission structure, is signed by any Defendant or agent thereof.

### DEFENDANT RETALIATES AGAINST PLAINTIFF BY TERMINATING HIM

74. On May 14, Mr. Murphy sent Plaintiff a Performance Improvement Plan noting that Plaintiff did not make enough phone calls on two dates in April 2024 and two dates in May 2024.

75. While the Performance Improvement Plan is dated May 10, 2024, it was not sent to Plaintiff until May 14, 2024.

76. Plaintiff was placed on a 2-week probationary period and was required to have a daily total of 50 calls per day by May 27, 2024.

77. Plaintiff met this and all other requirements imposed on him.

78. Prior to then, Plaintiff had been praised by his managers, received nothing but positive performance evaluations, and, just a few months before, sold the company's second largest contract.

79. On May 22, 2024, Mr. Murphy told Plaintiff that Plaintiff would receive commissions on the account for that large enterprise sale, with the first installment beginning on Plaintiff's June 15, 2024 paycheck.

80. On June 13, Mr. Murphy reprimanded Plaintiff for clocking in early (at 7:30 a.m.), despite Defendant never having established or communicated specific working hours for its BDRs.

81. Defendant refused to provide Plaintiff with information concerning his commissions, the rate it was being paid, how many drivers had been trained, or any other information concerning the large enterprise contract.

82. A few days later, on June 18, Mr. Murphy called Plaintiff and informed him that Plaintiff was terminated effective immediately because Plaintiff could not be "coming in and working whatever hours [he] wants."

83. Since then, in or about July 2024, Defendants were able to secure a $100 million investment to continue growing the company.

84. On information and belief, securing that investment would not have been possible but for Plaintiff's large enterprise sale.

## CLAIMS FOR RELIEF

### COUNT I
**Breach of Contract**
**against Defendant Rock Gate Capital, LLC**

85. Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

86. Defendant Rock Gate Capital LLC's CEO, Steve Gold, offered Plaintiff a commission for making Enterprise contract sales on behalf of Rock Gate Capital.

87. Plaintiff accepted this offer and performed by attempting to make and making Enterprise contract sales.

88. As a result, Plaintiff entered into a valid and enforceable agreement with Rock Gate Capital, LLC requiring the payment of commissions for Enterprise sales.

89. Defendant Rock Gate Capital, LLC willfully breached the agreement with Plaintiff by failing to pay him for commissions he earned selling Enterprise contracts.

90.     As a direct and proximate result of Defendant Rock Gate Capital, LLC's breach of contract, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

**COUNT II**
**Violation of the Covenants of Good Faith & Fair Dealing**
**against Defendant Rock Gate Capital, LLC**

91.     Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

92.     Rock Gate purposely engaged in a course of conduct, including by placing Plaintiff on a sham performance improvement plan, intended to prevent Plaintiff from securing the benefits of his bargain with Rock Gate.

93.     Plaintiff was one of the best performers in the company, even before securing enterprise sales for Rock Gate, and met all expectations of his position.

94.     Rock Gate terminated Plaintiff to avoid paying commissions otherwise owed as a result of Plaintiff's large enterprise sale and additional subsequent sales.

95.     Rock Gate's conduct was done in bad faith and deprived Plaintiff of the benefit of his bargain, namely, that if he made an Enterprise sale, he would be paid commissions for it.

96.     Rock Gate did so in order to retain the benefits of Plaintiff's work without paying him the commissions owed to him.

97.     As a direct and proximate result of Rock Gate's willful conduct, Plaintiff suffered damages in the amount of the commissions, as well as other damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## COUNT III
### Unpaid Overtime Wages in Violation of the FLSA
### against Defendants

98.     Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

99.     Under FLSA, 29 U.S.C., § 207, "no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty (40) hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

100.    At all relevant times, Defendants were employers within the meaning of the FLSA, 29 U.S.C. § 203(d), and at all relevant times had the authority to hire and fire, supervise and asserted control over scheduling and other terms and conditions of employment, determined rate and method of pay, and maintained employment records in connection with Plaintiff's employment.

101.    Specifically, at all relevant times, Rock Gate Capital CEO Steve Gold had control over the company's day-to-day operations, including the power to hire, fire, set wages, and directly supervise certain employees.

102.    At all relevant times, Mr. Gold was actively involved in the decisions leading to the alleged violations identified herein and had a direct role in the company's non-compliance.

103.    At all relevant times, Plaintiff was a non-exempt employee employed by Defendants within the meaning of the FLSA, 29 U.S.C. §§ 203(e)(1) and 213(a)(1).

13

104. At all relevant times, Defendants were engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

105. Throughout his employment, Plaintiff regularly worked in excess of 40 hours in a given workweek. 29 U.S.C. § 207(a).

106. Defendants failed to pay Plaintiff overtime for certain hours worked over 40 hours.

107. Defendants maintained a policy and practice of requiring BDRs to obtain approval prior to working overtime.

108. Managers would often withhold approval until Plaintiff had no choice, as a result of workload and deadlines, to work the hours.

109. After Plaintiff worked those, the managers would deny the overtime and refuse to pay Plaintiff, despite their knowledge that he worked the hours and sought approval in accordance with company policy.

110. Defendants' conduct was willfully and knowingly in disregard for the provisions of the FLSA by the failure to compensate Plaintiff overtime despite knowledge that he was caused and permitted to work hours in excess of 40 in any given week.

111. Records, if any, concerning the number of hours worked by Plaintiff and the actual compensation paid to Plaintiff are in the possession and custody of Defendants. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

112. Defendants also failed to properly disclose or apprise Plaintiff of his rights under the FLSA in accordance with 29 C.F.R. § 516.4.

113. As a direct and proximate result of Defendants' willful disregard for the FLSA, Plaintiff is entitled to an award of damages of unpaid overtime wages and an equal amount as liquidated damages, in addition to prejudgment interest, reasonable attorneys' fees, costs, and expenses.

**COUNT IV**
**Unpaid Overtime in Violation of NYLL**
**against Defendants**

114. Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

115. At all relevant times, Plaintiff was an "employee" within the meaning of New York Labor Law. Similarly, at all relevant times herein, Defendants were "employers" within the meaning of New York State Labor Law.

116. At all relevant times, CEO Steve Gold controlled the day-to-day operations of the company, including having the authority to hire and fire, supervise and assert control over scheduling and other terms and conditions of employment, determine rate and method of pay, and maintain employment records in connection with Plaintiff's employment.

117. At all relevant times, CEO Steve Gold knowingly permitted the company to violate the relevant chapters of the New York Labor Law and wage orders.

118. Defendants violated 12 NYCRR 142-3.2 by failing to pay Plaintiff overtime compensation for work he performed in excess of forty (40) hours in any given week.

119. The provisions relating to overtime and the payment of wages in the NYLL apply to Defendants and protect Plaintiff.

120. Defendant, pursuant to its policies and practices, refused and failed to pay the earned wages at the overtime wage rate to Plaintiff for all hours worked over forty (40) hours in a workweek.

121. Defendants' conduct, as alleged, constitutes a willful violation of the NYLL and the Plaintiff's rights without a good or reasonable basis.

122. Due to Defendants' willful NYLL violations, Plaintiff is entitled to recover from Defendants any underpayment of wages, reasonable attorneys' fees, and costs and disbursements of this action, liquidated damages equal to three hundred percent of the underpayment as a result of a willful violation, and other damages permissible in accordance with NYLL §198.

**COUNT V**
**Failure to Pay Earned Commission in Violation of NYLL § 190 *et seq.***
**against Defendants**

123. Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

124. As previously alleged, Plaintiff was a BDR who received commission-based wages for selling job postings and other services provided by the corporate Defendant.

125. Plaintiff earned commissions on the sale of such services, constituting "wages" within the meaning of NYLL § 190, *et seq*.

126. Defendant, however, failed to pay Plaintiff his earned commissions on Enterprise sales and as a result, Plaintiff has been denied earned wages required under NYLL § 190, *et seq*., and has suffered substantial economic damages.

127. Due to Defendants' willful NYLL violations, Plaintiff is entitled to recover from Defendants any underpayment of wages, reasonable attorneys' fees, and costs and disbursements

of this action, liquidated damages equal to three hundred percent of the underpayment as a result of a willful violation, and other damages permissible in accordance with NYLL §198.

## COUNT VI
### Failure to Pay Timely Wages in Violation of NYLL § 191
### against Defendants

128. Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

129. Plaintiff was a commissioned salesperson receiving percentage commissions pursuant to NYLL § 191.

130. The provisions relating to the timely payment of wages in NYLL § 191 apply to Defendants and protect Plaintiff.

131. Defendants violated NYLL § 191(1)(c) by failing to pay Plaintiff commissions owed in accordance with the time limits set forth under the law to the injury of Plaintiff.

132. Moreover, Defendants failed to comply with the requirements of NYLL § 191(1)(c) by failing to provide Plaintiff with signed copies of any of his commission agreements, or with information regarding the earning or payment of his commissions.

133. In addition to not paying certain commissions at all, Defendants also paid certain other commissions months late, facilitated by their refusal to provide Plaintiff with information regarding his commissions.

134. Due to Defendants' willful NYLL violations, Plaintiff is entitled to recover from Defendants any underpayment of wages, reasonable attorneys' fees, and costs and disbursements of this action, liquidated damages equal to three hundred percent of the underpayment as a result of a willful violation, and other damages permissible in accordance with NYLL §198.

## COUNT VII
### Retaliation in Violation of the FLSA
### against Defendants

135.    Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

136.    FLSA, 29 U.S.C. § 215 prohibits an employer from discharging, penalizing or discriminating against an employee in retaliation for making a complaint that the employer has "violate[d] any provision of [the Labor Law]" or because such employee "has caused to be instituted ... a proceeding under or related to [the Labor Law]."

137.    Plaintiff is an employee within the meaning contemplated by the FLSA, 29 U.S.C.§ 203.

138.    Defendants retaliated against Plaintiff, including but not limited to, withholding his earned commissions and terminating his employment, after he made complaints about Defendant's failure to pay his rightful wages in violation of the FLSA and NYLL.

139.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages, including liquidated damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## COUNT VIII
### Retaliation in Violation of NYLL § 215
### against Defendants

140.    Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

141.    Under NYLL § 215(1)(a) "[n]o employer or his or her agent… or any other person, shall discharge… any employee [] because such employee has made a complaint to his or her

18

employer… that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter…."

142.    By discharging Plaintiff immediately after Plaintiff complained about non-payment of commissions he was entitled to under NYLL § 191(1)(c), and creating false and pretextual reasons to justify such termination, Defendants violated NYLL § 215(1)(a).

143.    Due to Defendant's willful violations of the NYLL, without a good or reasonable basis, Plaintiff is entitled to recover from Defendant, lost wages due to his wrongful termination under the NYLL § 215, in addition to all other damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## COUNT IX
### Retaliation in Violation of NYLL § 740
### against Defendants

144.    Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

145.    Under NYLL § 740(2) "[a]n employer shall not take any retaliatory action against an employee . . . because such employee . . . . (a) discloses or threatens to disclose to a supervisor or to a public body and activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation . . . or (c) objects to, or refuses to participate in any such activity, policy or practice."

146.    Defendants violated NYLL § 740 by discharging Plaintiff immediately after and because Plaintiff complained about non-payment of commissions he was entitled to under NYLL § 191(1)(c) and fraudulent practices by Truckers Network, in addition to Defendants subsequently creating false and pretextual reasons to justify such termination.

19

147. Due to Defendants' willful violations of the NYLL, without a good or reasonable basis, Plaintiff is entitled to recover from Defendant, lost wages due to his wrongful termination under the NYLL § 740, in addition to all other damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

**COUNT X**
**Failing to Pay Sick Leave in Violation of NYLL § 196-B**
**against Defendants**

148. Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

149. NYLL § 196-b(1)(c) provides that "[f]or employers with one hundred or more employees in any calendar year, each employee shall be provided with up to fifty-six hours of paid sick leave in each calendar year."

150. NYLL § 196-b(1)(b) provides "[f]or employers with between five and ninety-nine employees in any calendar year, each employee shall be provided with up to forty hours of paid sick leave in each calendar year…."

151. By failing to provide Plaintiff with paid sick leave, Defendant violated Plaintiff's statutory rights under the NYLL.

152. The foregoing conduct, as alleged, constitutes a willful violation of the NYLL without a good or reasonable basis.

153. Due to Defendants' willful NYLL violations, Plaintiff is entitled to recover from Defendant any underpayment of wages for sick leave, reasonable attorneys' fees, and costs and disbursements of this action, liquidated damages equal to three hundred percent of the underpayment as a result of a willful violation, and other damages permissible in accordance with NYLL §198.

## COUNT XI
**Fraudulent Inducement
against Defendants**

154. Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

155. Defendants misrepresented that Plaintiff would be compensated in accordance with regular payroll for making Enterprise sales.

156. As a result of Defendants' representations, Plaintiff expended significant time and resources on cultivating relationships and other efforts necessary to make Enterprise sales.

157. Defendants' representation was material insofar as it was the sole inducement for Plaintiff's action.

158. Defendants had no intention of compensating Plaintiff for his full commission on any Enterprise sales.

159. On information and belief, Defendants ran a one-time scam on its sales employees and utilized Enterprise sales like Plaintiff's to supplement its dire financial situation, without any intention of paying commissions to Plaintiff and its other sales employees for securing such sales.

160. Plaintiff would not put forth such efforts and made Enterprise sales were it not for Defendants' promises and inducements and certainly would not have done so if he knew that Defendants would subsequently terminate Plaintiff to avoid paying Plaintiff the commissions he is owed.

## COUNT XII
### Quantum Meruit (in the alternative to Counts I, II, V, VI, VII, VIII, IX, XI) against Defendants

161.    Plaintiff incorporates the foregoing Paragraphs 1 – 83, 98 – 112, 114 – 121, 148 – 152 as if fully stated herein. Plaintiff performed services in good faith and in reliance on Defendants' assurances.

162.    Defendants accepted said services. There was an expectation that Plaintiff be paid commissions for the services performed.

163.    Plaintiff is entitled to payment for the reasonable value of the services rendered in an amount to be determined at trial.

164.    Due to Defendants' willful conduct, Plaintiff is entitled to recover from Defendants any underpayment and all other damages permitted under the law, to the maximum extent.

### PRAYER FOR RELIEF

Plaintiff asks the Court to enter judgment finding in Plaintiff's favor against Defendants and issue an order:

a.  Declaring that the actions complained of herein willfully violated the Fair Labor Standards Act (29 U.S.C. § 201 *et seq.*) and the New York Labor Law (N.Y. Lab. Law § 190 *et seq.*, § 650 *et seq,*), in effect at the time of violation;

b.  An award of unpaid wages at the overtime wage rate due under the FLSA § 207;

c.  An award of liquidated damages as a result of Defendant's failure to pay wages at the overtime rate pursuant to 29 U.S.C. § 216;

d.  An award of unpaid wages at the overtime wage rate under the NYLL § 198;

e.  An award of liquidated damages in the amount of three hundred percent of the wages owed for Defendants' failure to pay wages at the overtime wage rate, failure to pay sick leave, and failure to pay commissions pursuant to the NYLL;

f.  An award of lost wages for retaliatory termination under NYLL § 215 and FLSA § 215;

g.  An award of front pay for retaliatory termination pursuant to NYLL § 740;

h.  An award of pre-judgment and post-judgment interest pursuant to NYLL § 663;

i.  An award of reasonable attorneys' fees, expenses, and costs of this action; and

22

j.   Awarding such other relief as the Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues as to which a jury trial is available.

Dated: January 31, 2025                                Respectfully submitted,

**MATTHEW HERMAN**

By:  /s/   *Laura Luisi*
Laura Luisi (Atty. No. 6321034)
Jamie Holz (Atty. No. 6319247)
**LUISI HOLZ LAW**
LuisiL@luisiholzlaw.com
HolzJ@luisiholzlaw.com
161 N. Clark Street, Suite 16000
Chicago, Illinois 60601
Tel: (312) 639-4478

*Attorneys for Plaintiff*