**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MATTHEW HERMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 25 C 1088 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| ROCK GATE CAPITAL, LLC d/b/a | ) |
| 160 DRIVING ACADEMY and | ) |
| TRUCKER'S NETWORK, an Illinois | ) |
| corporation, and STEVE GOLD, | ) |
| individually in his personal capacity, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Plaintiff Matthew Herman brings this suit against his former employer, Defendant Rock Gate Capital, LLC d/b/a 160 Driving Academy and Trucker's Network ("Rock Gate"), and Rock Gate's owner and Chief Executive Officer ("CEO"), Defendant Steve Gold. Herman brings claims for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, violations of New York Labor Law ("NYLL"), N.Y. Lab. Law § 190 *et seq.*, breach of contract, breach of the covenants of good faith and fair dealing, fraudulent inducement, and quantum meruit. In response, Defendants bring a motion to compel arbitration and dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(3) and a partial motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Because the Court finds that the parties entered into a valid arbitration agreement, the Court grants Defendants' motion to compel arbitration and stays the proceedings. The Court denies Defendants' motion to dismiss pursuant to Rule 12(b)(3) as improper and also denies Defendants' motion to dismiss pursuant to Rule 12(b)(6) as moot.

**BACKGROUND**[1]

Rock Gate operates 160 Driving Academy, a school that provides truck driver training classes at over 100 locations nationwide, and Trucker's Network, a truck driver recruiting platform. Gold owns and operates Rock Gate and also acts as the company's CEO. Rock Gate employs business development representatives ("BDRs") to sell three types of services: (1) job posting services through the Trucker's Network platform, (2) training courses for individual truck drivers, and (3) enterprise sales to companies for truck driver training of companies' driver fleet.

Specific to the first service, Defendants created a software application for the Trucker's Network to allow companies to advertise job postings and recruit truck drivers who already have appropriate training and certifications. Trucker's Network primarily sells its service marketing job openings to experienced truck drivers. Defendants claim, including on its Trucker's Network website, that Trucker's Network includes over 200,000 curated commercial driver's license ("CDL") drivers for companies to find "qualified drivers more efficiently than any other hiring platform." Doc. 1 ¶ 18.

Herman signed Rock Gate's offer letter (the "Offer Letter") on January 5, 2022, and began his employment as a BDR on January 10, 2022, working remotely from his home in New York. Herman initially primarily sold job postings and services for Trucker's Network. Pursuant to the Offer Letter, Rock Gate paid Herman an annual base salary of $50,000. Through the 2022 Trucker's Network commission plan (the "2022 TN Commission Plan"), Herman also was eligible to receive 40% commission on total gross revenue produced for the sale of

---

[1] For the purposes of resolving the motion to compel arbitration, the Court draws the background facts from the parties' pleadings, *Reineke v. Cir. City Stores, Inc.*, No. 03 C 3146, 2004 WL 442639, at*1 (N.D. Ill. Mar. 8, 2004), and also considers exhibits and affidavits regarding the arbitration agreement in question, *Brown v. Worldpac, Inc.*, No. 17 CV 6396, 2018 WL 656082, at *2 (N.D. Ill. 2018).

Trucker's Network job postings plus add-ons, which were additional services a BDR could add on to a client's list of services, such as text boost notifications. At no point during his employment did Herman act as a manager or supervisor, possess the authority to hire or fire other employees, direct any other employees' work, or otherwise contribute to the management of Rock Gate. Gold, however, oversaw and made decisions regarding Herman and other employees' compensation.

Within the first two months of Herman's employment, he became one of the highest earning BDRs in the company. His manager, Phil Amato, did not track BDR calls per day so long as BDRs met their sales quota, which Herman did. Rather than tracking calls, Amato told Herman to focus on making sales and building client relationships. Herman received positive performance evaluations throughout 2022. In January 2023, Rock Gate amended Herman's commission plan (the "2023 TN Commission Plan") to require him to make a minimum $5,500 in job post advertisement revenue per month to be eligible to earn any commissions.

At the time Herman was subject to the 2022 TN Commission Plan, Rock Gate did not have an enterprise sales department nor otherwise hire or instruct BDRs to make enterprise sales. Enterprise sales consist of large contracts training an entire workforce of drivers. After Herman was subject to the 2023 TN Commission Plan, Gold, during sales meetings and other company events in 2023, continually stressed that Rock Gate was transitioning its sales focus to large enterprise sales contracts and that BDRs should make every effort to expand their existing client relationships to sell enterprise services. Gold insisted that Rock Gate would pay BDRs for all enterprise contracts that they secured. Specifically, Gold explained that BDRs should deliver enterprise clients to Gold and then Rock Gate would pay BDRs for all final sales made thereafter

to that client.  Based on his discussion with Gold, Herman believed that he would earn far more money through enterprise sales than he had earned through Trucker's Network sales.

Herman thus took significant efforts to make enterprise sales, targeting companies with driver fleets to sell truck driver training contracts.  In or about October 2023, Herman procured an enterprise contract for training a large driver fleet that included training thousands of drivers at a per driver rate.  Emily Cavelier, a Rock Gate c-suite executive, told Herman that Rock Gate began training drivers under the contract in December 2023.  Then, on December 28, 2023, Gold announced that this contract procured by Herman was the second largest client deal in company history and that Herman would receive the commission for generating this account.  If Rock Gate paid Herman only a three percent commission on this contract, he would receive millions of dollars.

In or about February 2024, Gold offered Herman a new position making enterprise sales full time, which Herman accepted.  Throughout early 2024, Herman made various enterprise sales.  Rock Gate, however, refused to pay Herman his full commissions on those sales, including on the large sale he made in October 2023.  Gold and Herman's supervisors refused to provide Herman with a summary of his commissions or sales for enterprise contracts, despite Herman asking multiple times.  Herman continued to request payment for the enterprise sales he made in late 2023 and early 2024 throughout March, April, and May 2024.

Also in the first half of 2024, Herman made certain complaints to his supervisors about Trucker's Network sales and his belief that the company was not accurately representing current and prospective truck driver job postings.  For example, Rock Gate claimed that there were over 200,000 qualified truck drivers available for hire on its Trucker's Network, but Herman believed Rock Gate drastically inflated this number based on complaints he received from his Trucker's

Network customers that, despite posting multiple ads monthly, they were not receiving the qualified drivers advertised. Specifically, customers complained that the number of Trucker's Network members and the members' actual experience did not measure up to what Rock Gate and Gold marketed to potential customers. Herman learned from his clients that even if a client specifically requested more experienced drivers and paid more for premium advertisement slots, the only drivers available were new graduates with little experience. Herman's supervisors, however, brushed his concerns aside and did not address his complaints.

On the morning of May 10, 2024, Kevin Murphy, Herman's manager, called Herman and informed him that Rock Gate was eliminating Herman's position, rescinding his prior employment agreement, and converting Herman to an hourly employee. Murphy stated that Herman would receive a new commission plan to sign encompassing both Trucker's Network and enterprise sales (the "2024 TN and Enterprise Commission Plan"). Murphy promised Herman that the 2024 TN and Enterprise Commission Plan would make it easier for Herman and other BDRs to earn commissions and increase their overall wages. Around 2:00 p.m. that same day, Murphy called Herman again and screamed at him to sign the 2024 TN and Enterprise Commission Plan, stating that if Herman did not sign it by the end of the day, Rock Gate would no longer permit Herman to sell enterprise services and would potentially terminate him.

Fearful of termination, Herman signed the 2024 TN and Enterprise Commission Plan immediately after the call, though neither Rock Gate nor any of its agents signed the agreement. Under the 2024 TN and Enterprise Commission Plan, Herman would not earn commissions on Trucker's Network sales until he reached fifteen total sales in the month. Additionally, Herman would receive a 3% commission on any enterprise sales made in the first year of the agreement and a 1.5% commission on any enterprise sales made in the second year. Herman believed that

5

the terms of the 2024 TN and Enterprise Commission Plan would apply beginning June 1, 2024 and did not encompass any enterprise sales made before this date.  Separately, Herman subsequently received a new offer letter agreement for his hourly position to review and negotiate, but he did not sign it before his termination.

On May 14, 2024, Murphy sent Herman a performance improvement plan dated May 10, 2024, which noted that Herman did not make enough sales calls on two dates in April 2024 and two dates in May 2024.  Prior to receiving this performance improvement plan, Herman's managers praised him and provided him with only positive performance evaluations.  The performance improvement plan placed Herman on a two-week probationary period and required him to make fifty total calls per day by May 27, 2024.  Herman met all the requirements imposed by the performance improvement plan.

On May 22, 2024, Murphy told Herman that he would receive commissions on the large October 2023 enterprise sale, with the first installment included in Herman's June 15, 2024 paycheck.  However, Rock Gate continued to refuse to provide Herman with any other information concerning his commissions.  On June 13, 2024, Murphy reprimanded Herman for clocking in early, at 7:30 a.m., despite Rock Gate never establishing or communicating specific working hours for BDRs.  Then on June 18, 2024, Murphy called Herman and informed him that Rock Gate terminated his employment, effective immediately, because Herman could not be "coming in and working whatever hours [he] wants."  Doc. 1 ¶ 82.

## ANALYSIS

### I.      Motion to Compel Arbitration

Section 3 of the Federal Arbitration Act ("FAA") requires courts to stay a proceeding and to compel arbitration of any matter covered by a valid arbitration agreement.  *AT&T Mobility*

*LLC v. Concepcion*, 563 U.S. 333, 344 (2011).  A federal court may compel arbitration where there is (1) a written agreement to arbitrate, (2) a dispute within the scope of the agreement, and (3) a refusal to arbitrate by one of the parties to the agreement.  *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005).  Agreements mandating arbitration are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Contract defenses, such as fraud, duress, and unconscionability, apply to agreements to arbitrate.  *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010).  The party seeking to avoid arbitration bears the burden of establishing why the arbitration agreement should not be enforced.  *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000).

Defendants argue that Herman entered into a binding arbitration agreement (the "Arbitration Agreement") that requires the Court to compel arbitration.  While Herman does not dispute that his claims fall within the scope of the Arbitration Agreement or that he refuses to arbitrate, he nonetheless maintains that the Arbitration Agreement resulted from fraud and is thus unenforceable.[2]

More specifically, Defendants argue that Herman entered into the Arbitration Agreement as part of the Offer Letter that Herman signed on January 5, 2022.  The Arbitration Agreement states in pertinent part:

> Any controversy, claim or dispute arising out of or relating in any
> way to your employment or other service relationship with the

---

[2] The Court entered an Order granting Defendants' motion to compel arbitration, Doc. 34, but Herman moved for reconsideration before the Court could issue its Opinion explaining its reasoning for that decision, Doc. 35.  The parties then briefed the motion for reconsideration without the benefit of the Court's reasoning.  The Court has reviewed Herman's reconsideration motion, which only reasserts arguments that Herman made in response to Defendants' motion to compel arbitration—namely, that Defendants voided the Offer Letter and that the Arbitration Agreement is otherwise unenforceable.  The Court has taken into consideration Herman's reasserted arguments before issuing this Opinion but, as set forth below, it finds no reason to change the outcome and stands by its Order compelling arbitration.

> Company or otherwise relating to this agreement (including, without limitation, any claims of unlawful employment discrimination, whether based on age or otherwise, any noncompliance with wage and hour laws, and any allegation of misclassification as an independent contractor) shall, to the fullest extent permitted by law, be settled by arbitration in any forum and form agreed upon by the parties or, in the absence of such an agreement, under the auspices of the American Arbitration Association ("AAA") in Chicago, Illinois in accordance with the Employment Dispute Resolution Rules of the AAA, including, but not limited to, the rules and procedures applicable to the selection of arbitrators.

Doc. 18-1 at 4. Relying on Illinois law, Defendants claim that the parties and the Arbitration Agreement satisfied all elements of a valid contract—offer, acceptance, and consideration—because Rock Gate offered the Offer Letter to Herman, Herman accepted the offer by signing the written document, and the Offer Letter was supported by consideration of Rock Gate's employment of Herman and the associated benefits.

In response, Herman first asserts that Defendants waived arbitration by relying on Illinois law rather than New York law in their motion because the Offer Letter includes a choice of law provision. That provision states that the Offer Letter "will be governed by the laws of the state in which [Herman] reside[d] at the time [he] sign[ed] this letter." Doc. 18-1 at 3. Herman lived in New York at the time he signed the Offer Letter, meaning New York law governs the Offer Letter. While Defendants cite Illinois contract law in support of their contract validity argument, *see* Doc. 18 at 5, they discuss New York law when responding to the enforceability arguments that Herman raises in his opposition brief.

Courts, not arbitrators, decide whether a party has waived the right to compel arbitration. *Al-Nahhas v. 777 Partners LLC*, 129 F.4th 418, 424 (7th Cir. 2025). In the arbitration context, waiver "encompasses both intentional relinquishments and implicit abandonments of the right" to arbitrate. *Smith v. GC Servs. Ltd. P'ship*, 907 F.3d 495, 499 (7th Cir. 2018). "[W]aiver can be

8

express or implied through action." *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 891 (7th Cir. 2020). When courts evaluate whether to infer a party's waiver, they consider whether "a party acted inconsistently with the right to arbitrate." *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods., Inc.*, 660 F.3d 988, 994 (7th Cir. 2011). Courts specifically analyze "the diligence or lack thereof of the party seeking arbitration—did that party do all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration?" *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995). Factors include "whether the allegedly defaulting party participated in litigation, substantially delayed its request for arbitration, or participated in discovery." *Kawasaki Heavy Indus.*, 660 F.3d at 994.

Although Defendants initially relied on Illinois rather than New York law, they still advanced their arguments about arbitration at an early stage in the litigation, without delay and before the parties engaged in discovery. Defendants filed their motion to compel arbitration, concurrently with a motion to dismiss, on the date their responsive pleading was due. Defendants' actions, therefore, demonstrate their desire to arbitrate at the earliest possible juncture. The Court thus finds that Defendants did not waive the right to compel arbitration.

Turning to Herman's more substantive arguments, he contends that the Arbitration Agreement is unenforceable under New York law because it forms part of Defendants' fraudulent scheme to induce employees like Herman to sign the Offer Letter "under unfavorable and unlawful terms that would ultimately benefit Defendants." Doc. 27 at 7. The United States Supreme Court has stated that, "as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006), and has expressly determined that arbitrators, rather

9

than courts, should decide a claim of fraud in the inducement of a contract generally, rather than the arbitration clause itself, even in the face of a contrary state rule, *see Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 399–400 (1967). Similarly, New York law provides that, generally, if "the parties have agreed to a broad arbitration clause, the issue of fraud in the inducement is one for the arbitrator," *Info. Scis., Inc. v. Mohawk Data Sci. Corp.*, 374 N.E.2d 624, 625 (N.Y. 1978), because "a broad arbitration provision is separable from the substantive provisions of a contract such that the agreement to arbitrate is valid even if the substantive provisions were induced by fraud," *Markowits v. Friedman*, 42 N.Y.S.3d 218, 222 (N.Y. App. Div. 2016).

Nonetheless, Herman asserts that the Court cannot compel arbitration because Defendants permeated the whole Offer Letter with fraud and included the Arbitration Agreement to accomplish their fraudulent scheme. However, because Herman claims fraud in the inducement of the Offer Letter generally, rather than fraud directed at the Arbitration Agreement separately, an arbitrator, rather than the Court, should resolve the claim. *See Prima Paint*, 388 U.S. at 403–04 ("Accordingly, if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.").

Perhaps recognizing this deficiency in his argument, Herman uses New York law to argue that the Arbitration Agreement itself is part of a "grand scheme" to defraud that permeated the entire Offer Letter, rendering the Arbitration Agreement unenforceable under New York law. Doc. 27 at 6. New York law provides that "[t]he issue of fraud in the inducement affects the validity of the arbitration clause only when the fraud relates to the arbitration provision itself, or

10

was part of a grand scheme that permeated the entire contract." *Anderson St. Realty Corp. v. New Rochelle Revitalization, LLC*, 913 N.Y.S.2d 114, 116 (N.Y. App. Div. 2010) (citation omitted) (internal quotation marks omitted). "To demonstrate that fraud permeated the entire contract, it must be established that the agreement was not the result of an arm's length negotiation, or the arbitration clause was inserted into the contract to accomplish a fraudulent scheme." *Id.*

Herman does not contend that the agreement did not result from an arm's length negotiation but argues that Defendants inserted the Arbitration Agreement to accomplish the type of fraudulent scheme discussed in *Anderson Street*. Specifically, Herman alleges that Defendants structured his Offer Letter to induce him into accepting unfavorable and unlawful compensation terms and inserted the Arbitration Agreement to further this fraudulent scheme by forcing Herman to arbitrate his compensation-related claims, therefore increasing the costs, labor, and hurdles he faces to secure relief. Even ignoring the fact that Herman offers nothing other than conclusory allegations to advance his fraudulent scheme theory, his New York law-based argument fails because the Supreme Court in *Prima Paint* "rejected application of state severability rules to the arbitration agreement without discussing whether the challenge at issue would have rendered the contract void or voidable," and "expressly disclaimed any need to decide what state-law remedy was available." *Buckeye Check Cashing*, 546 U.S. at 446; *see also Convergen Energy LLC v. Brooks*, No. 20-CV-3746, 2020 WL 4500184, at *7 (S.D.N.Y. Aug. 5, 2020) (rejecting the plaintiff's New York law fraudulent scheme argument as inapplicable under *Buckeye Check Cashing* and *Prima Paint*). Accordingly, whether Defendants induced Herman to sign the Offer Letter as part of a fraudulent scheme remains an issue for the arbitrator, not the Court.

11

Finally, Herman argues that Defendants voided the Offer Letter, making it unenforceable now.  Herman contends that Defendants voided the Offer Letter when Murphy called Herman on May 10, 2024, and informed Herman that the Offer Letter was "no longer valid or enforceable." Doc. 27-1 ¶ 27.  Even assuming Defendants voided Herman's Offer Letter on May 10, 2024, Herman's argument fails because his claims arose while the Offer Letter remained in effect and therefore the broad Arbitration Agreement still applies.  *See Johnson v. Travelers Prop. Cas.*, 56 F. Supp. 2d 1025, 1026 (N.D. Ill. 1999) (compelling arbitration of employee's claims against his former employer, even though the employee initiated his suit after the former employer discharged him, because the broad arbitration provision covered "all employment disputes (including termination of employment) that [an employee] might have with [the former employer]").

Herman separately asserts that Defendants voided the Offer Letter by making various material alterations to the Offer Letter without Herman's mutual assent.  Specifically, Herman points to Defendants' amendments to his commission structure and sales priorities.  Herman, however, has alleged that he signed commission agreements annually and separately from the Offer Letter.  *See AT&T Corp. v. Atos IT Sols. & Servs., Inc.*, 708 F. Supp. 3d 385, 402–03 (S.D.N.Y. 2008) (noting that "[i]t is a bedrock principle of contract law" that a subsequent contract that does not pertain to "precisely the same subject matter" will not supersede an earlier contract unless the subsequent contract contains definitive language indicating that it revokes, cancels, or supersedes that specific prior contract).  As to Herman's evolving job responsibilities, the Offer Letter generally describes Herman's position.  Herman agreed to be a "Business Development Representative" and to "perform such duties as the Company determines from time to time."  Doc. 18-1 at 2.  The Offer Letter allowed Defendants to broadly direct Herman's job

duties without voiding the contract or the Arbitration Agreement. Therefore, any changes to Herman's duties as a BDR fell within the original Offer Letter's mandate.

Even assuming Defendants' changes to Herman's job responsibilities modified the Offer Letter, Herman continued his work for Defendants, thus accepting these modifications and failing to invalidate the Arbitration Agreement. *See Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 223 (S.D.N.Y. 2013) (noting that an at-will employee's continued employment can constitute sufficient consideration to support an enforceable contract). Perhaps most importantly, even if Defendants materially changed some terms of the Offer Letter, the Arbitration Agreement is severable from the remainder of the Offer Letter, *Buckeye*, 546 U.S. at 445, making the Arbitration Agreement still enforceable, *Rent-A-Center*, 561 U.S. at 70 ("Thus, a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate.").

Because Herman does not contest that he entered into the Arbitration Agreement, and because he has not successfully shown that the Arbitration Agreement is unenforceable, the Court grants Defendants' motion to compel arbitration.[3]

## II.     Gold and the Arbitration Agreement

In a footnote, Herman correctly points out that Gold is a party to this action but not a signatory to the arbitration agreement. However, the Supreme Court has held that "a litigant who was not a party to the arbitration agreement may invoke § 3 [of the FAA to stay proceedings] if the relevant state contract law allows him to enforce the agreement." *Arthur*

---

[3] Herman requests discovery and a trial to resolve any disputes of fact if the Court finds a material dispute as to arbitrability. Because the Court does not find a material dispute as to arbitrability, the Court rejects this request. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735–36 (7th Cir. 1995) (affirming the district court's decision to compel arbitration without a trial on whether the parties formed a contract because the plaintiff did not identify a triable fact concerning the existence of the arbitration agreement).

*Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009). The New York Court of Appeals has recognized that a rule "allowing corporate officers and employees to enforce arbitration agreements entered into by their corporation 'is necessary not only to prevent circumvention of arbitration agreements but also to effectuate the intent of the signatory parties to protect individuals acting on behalf of the principal in furtherance of the agreement.'" *Degraw Const. Grp., Inc. v. McGowan Builders, Inc.*, 58 N.Y.S.3d 152, 155 (N.Y. App. Div. 2017) (quoting *Hirschfeld Prods., Inc. v. Mirvish*, 673 N.E.2d 1232, 1233 (N.Y. 1996)). Here, Herman alleges that Gold was always Rock Gate's CEO during Herman's employment with the company, and Herman's allegations concerning Gold arise from his activities as CEO. Accordingly, the Court finds that Gold may appropriately compel arbitration of Herman's claims against him. *See, e.g.*, *Hirschfeld Prods.*, 673 N.E.2d at 1233 ("Federal courts have consistently afforded agents the benefit of arbitration agreements entered into by their principals to the extent that the alleged misconduct relates to their behavior as officers or directors or in their capacities as agents of the corporation."); *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir. 1993) ("Courts in this and other circuits consistently have held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement."); *Sanders v. Forex Cap. Mkts., LLC*, No. 11-CV-0864, 2011 WL 5980202, at *11 (S.D.N.Y. Nov. 29, 2011) (granting motion to compel arbitration and finding that where plaintiff and defendant company entered into arbitration agreement, claims against the company's CEO "must be arbitrated"); *McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.*, No. 14-CV-6633, 2015 WL 144190, at *7 n.8 (S.D.N.Y. Jan. 12, 2015) (collecting cases supporting "the proposition that an arbitration agreement may be enforced by and against agents, employees, and/or officers of a corporate entity").

14

### III.    Motion to Dismiss Pursuant to Rule 12(b)(3)

Given the Court's conclusion that the case should proceed to arbitration, the Court must decide whether to dismiss or stay the case.  Defendants appear to contend that the Court should dismiss the case under Federal Rule of Civil Procedure 12(b)(3) as brought in the improper venue.  But the Seventh Circuit has made clear that an arbitration agreement's enforcement does not amount to a challenge to the proper venue and that courts should instead stay cases pending the completion of arbitration proceedings.  *Rodgers-Rouzier v. Am. Queen Steamboat Operating Co.*, 104 F.4th 978, 984 (7th Cir. 2024).  "Venue is determined solely by reference to federal law—generally 28 U.S.C. § 1391—not the parties' contractual agreements." *Id.* (citing *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 55–56 (2013)).  Because the Court has no basis to dismiss the action for lack of venue, the Court denies Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(3).  The Court instead stays these proceedings pursuant to § 3 of the FAA.  *See* 9 U.S.C. § 3 (requiring courts to stay proceedings if they find a suit appropriate for arbitration).[4]

---

[4] Because the Court finds it appropriate to compel Herman's claims to arbitration, the Court denies Defendants' motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) as moot. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019) ("We have held that a court may not rule on the potential merits of the underlying claim that is assigned by contract to an arbitrator, even if it appears to the court to be frivolous." (quotations omitted)); *Parker v. Verizon Commc'ns Inc.*, No. 24 C 08436, 2025 WL 1547291, at *5 (N.D. Ill. May 30, 2025) (denying motion to dismiss for failure to state a claim as moot because the court compelled the plaintiffs' claims to arbitration).

**CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to compel arbitration and dismiss pursuant to Rule 12(b)(3) [18], and denies Defendants' motion to dismiss pursuant to Rule 12(b)(6) [16] as moot. The Court compels arbitration of Herman's claims and stays this case during the pendency of arbitration. The Court denies Herman's motion for reconsideration [35].


Dated: March 30, 2026

SARA L. ELLIS
United States District Judge